NO. 07-06-0301-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C
Â 
MARCH 31, 2008
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â ______________________________

THE CITY OF GREY FOREST, APPELLANT

V.

GLEN W. VERNON AND DENISE G. VERNON
 AND PAUL GRANADO, APPELLEES
_________________________________

FROM THE 131ST DISTRICT COURT OF BEXAR COUNTY;

NO. 2002-CI-09980; HONORABLE JOE F. BROWN, JR., JUDGE
_______________________________


Before QUINN, C.J. and HANCOCK and PIRTLE, JJ.
OPINION
Â Â Â Â Â Â Â Â Â Â The City of Grey Forest (âGrey Forestâ) appeals the trial courtâs judgment in favor
of appellees, Glen W. Vernon, Denise G. Vernon, and Paul Granado, and award of
damages and attorney fees. We reverse and render judgment.
BackgroundOn August 18, 1971, Grey Forest annexed 47.67 acres of land, commonly referred
to as the âCoggeshall subdivision,â into the city limits. On February 26, 1995, the Vernons
entered into an earnest money contract with Mac Peck and Douglas Peterson to purchase
5.0106 of an 11.4178 acre tract of land within the Coggeshall subdivision for $23,000. In
the earnest money contract, a provision stated that the buyers were accepting the property
in its present condition. Further, the earnest money contract stated that it was the Vernonsâ
intent to use the property as a single family dwelling and provided the Vernons with the
option to terminate the contract to purchase the property if the Vernons âascertain that
applicable zoning ordinances, easements, restrictions or governmental laws, rules, or
regulations prevent such intended use or that such required utilities are not available Â .Â .Â .Â .â 
The closing date for the sale of the property was set by the parties as November 24, 1997. 
On April 14, 1995, Grey Forest recorded a sanitary control easement on a property
adjacent to the Vernonsâ property that prohibited all construction or operations that could
create an unsanitary condition within, upon, or across the cityâs property. The cityâs
property contained two wells used as a source of water for the cityâs public water system.
Â Â Â Â Â Â Â Â Â Â Â On September 6, 1995, the city council of Grey Forest voted to begin an inquiry into
the feasibility of providing utility services to the Coggeshall subdivision including the
possibility of paving Requa Road. On February 14, 1996, the Mayor of Grey Forest, Edwin
Faust, sent a letter to the property owners of the Coggeshall subdivision informing the
owners that the city, âin an effort to obtain city services to [the homes],â was seeking the
ownersâ commitment to convey an easement to the City. The letter also expressed that
âwe [the city] would like to continue the existing easements to create a continuous road.â 
Attached to the letter, a proposed roadway was highlighted that proceeded north-south
through the Vernonsâ property and turned east-west along the southern border of the
Vernonsâ property and the cityâs property. Both ends of the proposed Requa Road curved
to the west and connected to another roadway, Nottingham Lane.
Â Â Â Â Â Â Â Â Â Â On April 16, 1997, a second letter on City of Grey Forest letterhead was sent to the
mortgage companies with property interests in the Coggeshall subdivision. This second
letter explained that Coggeshall residents had requested that private access to their
property become public access and that Grey Forest had agreed to provide services and
a paved roadway once the existing easements had been designated as public. On July
1, 1997, the property owners, including Peck and Peterson, dedicated a street and utility
easement to Grey Forest. Attached to the easement dedication showing the easement
granted to the city was a plat showing a proposed roadway differing from the proposed
easement attached to the February 14, 1996 letter. The deviation changed the easement
along the southern boundary of the cityâs property to an easement through the cityâs
property. However, Grey Forest is not listed as a grantor on the street and utility easement
dedication. Instead, Grey Forest was the recipient of the easement. 
Â Â Â Â Â Â Â Â Â Â On November 24, 1997, the Vernons closed on the subject property and received
a warranty deed for the property. At the time of closing, no roadway existed on the
property. Although the earnest money contract contained a provision allowing the Vernons 
to terminate the contract if applicable easements prevented the intended use of the
property, no evidence was presented as to whether the Vernons questioned the reduction
of acreage in the conveyance, or questioned Peck and Peterson as to the conveyance of
an easement in exchange for the promise of utilities or a paved road. On February 23,
1999, the Grey Forest city council voted and passed Ordinance 118 accepting the
dedication of the street and utility easement of July 1, 1997 as a public street and right of
way. 
Â Â Â Â Â Â Â Â Â Â The Grey Forest council then requested bids from contractors for the Requa project. 
In its request, the city asked for bids for the project as a whole as well as for bids
separating the project into two parts, lower Requa Road and upper Requa Road. The city
council voted, on July 1, 1999, to reject the sole bid that Grey Forest received on the
Requa Road project as a whole. Instead, the city accepted a bid for lower Requa Road
and the council voted, on January 25, 2000, to end the project at the southern boundary
of the Vernonsâ property. The cityâs decision resulted in the Vernons having the paved
Requa Road and utility lines end at their southermost property line. In February of 2000,
the Vernons sold a subsection of their property nearest the cityâs property to Paul Granado;
the Granado property did not have access to the paved Requa Road or the utility lines
ending at the Vernonsâ property. Shortly after the sale of property to Granado, the city
erected a fence around its property in order to safeguard the cityâs water supply which had
the effect of blocking direct access to Nottingham Lane from Vernonsâ and Granadoâs
property.
Â Â Â Â Â Â Â Â Â Â The Vernons filed suit seeking a declaratory judgment against the city to enforce an
agreement they alleged that the city made to build a continuous road and provide utilities
in exchange for a grant of an easement over their property. Additionally, the Vernons
contended that Grey Forest breached a contract to build a continuous road and provide
utilities or, in the alternative, were estopped from denying a duty to build the road and
provide utilities in exchange for the granting of an easement. Granado joined as an
intervenor seeking to enforce a similar agreement contending that he relied, to his
detriment, on the cityâs promise to build a continuous road and utilities. In addition, the
Vernons complained that, although Grey Forest had never affirmatively granted them
permission to access their property from Nottingham Lane across the cityâs property, the
agreement to build a continuous loop obligated the city to allow them access to Nottingham
Lane across the cityâs property. A trial was held before the court on January 30 through
February 1, 2006. At the conclusion of the trial, the trial court ruled in favor of the Vernons
and Granado and awarded the Vernons $23,000 and Granado $18,000 in damages, with
the Vernons and Granado also recovering attorney fees. 
Â Â Â Â Â Â Â Â Â Â Additionally, the trial court made findings of fact and conclusions of law. The trial
court found that Grey Forest had agreed, by motion of the city council, to pursue the
feasibility of constructing a continuous loop between Requa Road and Nottingham Lane. 
The trial court also found that Grey Forest had agreed to create a continuous loop through
the subdivision in exchange for an easement and that Grey Forest ratified the agreement 
to pave Requa Road and provide utilities by acknowledging the Requa Road project during
council meetings, but that the city had failed to pave upper Requa Road. Additionally, the
trial court found that the Vernons and Granado substantially and reasonably relied, to their
detriment, upon Grey Forestâs promise to build a continuous loop, and further found that
the Vernons and Granado were damaged by Grey Forestâs failure to pave upper Requa
Road. 
Â Â Â Â Â Â Â Â Â Â However, the trial court also concluded that the Vernons entered into an earnest
money agreement on or about February 27, 1995, and that Grey Forest did not, by vote
of council, promise the Vernons or Granado that it would construct a loop between Requa
Road and Nottingham Lane. Additionally, the trial court concluded that the Vernons and
Granado did not have reasonable access to their property. The trial court further concluded
that Grey Forestâs decisions to end construction of the paved road at the southern border
of the Vernonâs property, to fence off its well site property, whether or not to improve an
easement, and when to open a dedicated street for public use, were all governmental
functions supported by legitimate governmental interests. 
Â Â Â Â Â Â Â Â Â Â Grey Forest appeals the judgment by eight issues contending that the trial court
erred by (1) finding that Grey Forest agreed to improve and pave a loop in exchange for
an easement; (2) finding that Grey Forest recognized or ratified the alleged agreement; (3)
finding that the Vernons and Granado substantially and reasonably relied upon the
agreement to their detriment; (4) admitting city council minutes to prove the ratification of
the agreement; (5) finding that the Vernons and Granado had standing because they did
not have adequate city services equal to other citizens; (6) finding that Grey Forest denied
the Vernons and Granado access to their property by barricading the cityâs well site; (7)
awarding damages; and (8) awarding attorney fees. Because of the relatedness of the
issues, we will begin our analysis by reviewing issues one, two, and three.
Law and Analysis
Â Â Â Â Â Â Â Â Â Â Under an abuse of discretion standard, the appellate court determines if the trial
court acted arbitrarily and unreasonably, and thus abused its discretion. See Morrow v.
H.E.B., Inc., 714 S.W.2d 297, 298 (Tex.1986). The reviewing court may not reverse the
trial court for an abuse of discretion because it disagrees with the trial court's decision so
long as that decision is within the trial court's discretionary authority. Beaumont Bank v.
Buller, 806 S.W.2d 223, 226 (Tex.1991); Downer v. Aquamarine Operators, Inc., 701
S.W.2d 238, 242 (Tex.1985). Unless the trial courtâs factual determinations were arbitary
and unreasonable, the reviewing court may not substitute its judgment for the trial courtâs
decisions committed to its discretion. See Walker v. Packer, 827 S.W.2d 833, 840 (Tex.
1992). However, the trial court has no discretion in regard to questions of law. See
Walker, 827 S.W.2d at 840. Interpretation of a statute is a pure question of law which is
reviewed de novo. See Tex. Gen. Indem. Co. v. Tex. Workersâ Comp. Commân, 36 S.W.3d
635, 640 (Tex.App.âAustin 2000, no pet.); Mitchell Energy Corp. v. Ashworth, 943 S.W.2d
436, 437 (Tex. 1997).
Â Â Â Â Â Â Â Â Â Â In reviewing the courtâs findings of fact, the trial court found that the city council did
not vote nor sign any contract that would obligate it to pave a road or provide utilities to the
residents of the Coggeshall subdivision. Thus, deferring to the trial courtâs findings, we
conclude that Grey Forest has not entered into an enforceable contract with the Vernons
or Granado. See Walker, 827 S.W.2d at 840.
Â Â Â Â Â Â Â Â Â Â We next review the trial courtâs findings on the Vernons and Granadoâs theory of
promissory estoppel. Although the trial court found that neither the city council nor its
mayor signed a contract, the trial court determined that the city council ratified the mayorâs
actions by taking actions consistent with the mayorâs alleged promise to provide services
in exchange for the granting of an easement. Since this is a fact issue, we again will defer
to the trial courtâs finding. See City of Dallas v. Vills. of Forest Hills, L.P., 931 S.W.2d 601,
604 (Tex.App.âDallas 1996, no writ) (officer of a city generally cannot bind or estop the
city in a matter placed exclusively within the authority of the governing body unless the
evidence clearly shows the officerâs conduct so closely related to the expressed will of the
governing body as to constitute an act of the body itself). And, though we defer to the trial
courtâs factual findings, we review the trial courtâs application of the facts to the law de
novo. See Tex. Gen. Indem. Co., 36 S.W.3d at 640.
Â Â Â Â Â Â Â Â Â Â A promisee is entitled to recover under the theory of promissory estoppel if (1) there
was a promise; (2) the promisor could have reasonably foreseen that the promisee would
rely on the promise; and (3) the promisee suffered a detriment as a result of the substantial
reliance on the promise. See Sipco Servs. Marine, Inc. v. Watt Field Serv. Co., 857
S.W.2d 602, 605 (Tex.App.âHouston [1st Dist.] 1993, no writ). By its first three issues,
Grey Forest argues that there was no agreement between Grey Forest and the Vernons
or Granado, that it could not have ratified any such agreement, and that the Vernons or
Granado could not have detrimentally relied on such an agreement. In essence, Grey
Forest contends that promissory estoppel is not an available remedy to the Vernons or
Granado. We agree.
Â Â Â Â Â Â Â Â Â Â At the time that the mayor sent letters to the property owners of the Coggeshall
subdivision, the only possible basis of the ratified agreement, the promisees would have
been Peterson and Peck. But no evidence was presented as to whether Peterson and
Peck detrimentally relied on the cityâs promise. Instead, the evidence in this case focused
on how the Vernons and Granado were detrimentally affected based on a substantial
reliance on the ratified agreement; however, neither the Vernons nor Granado were a
promisee of the cityâs ratified agreement. Therefore, we conclude that, as a matter of law,
Vernon and Granado have presented no evidence demonstrating proof of each element
necessary to establish recovery based on promissory estoppel, specifically that the
promisees, Peterson and Peck, suffered to their detriment because of their substantial
reliance on the cityâs ratified agreement. 
Â Â Â Â Â Â Â Â Â Â The Vernons and Granado also sought to estop the city from denying its
responsibility, under the ratified agreement, to provide a paved road and utilities by
asserting their status as successors in interest to the promise made to Peterson and Peck. 
But unless the promise is found to be enforceable, any potential beneficiary of such a
promise does not gain rights from the alleged promise. See Young Ref. Corp. v. Pennzoil
Co., 46 S.W.3d 380, 387 (Tex.App.âHouston [1st Dist.] 2001, pet. denied). In fact, without
a showing that the Vernons and Granado were intended beneficiaries, the presumption is
against conferring benefits to third parties. Id. The Vernons and Granado did not present
evidence demonstrating that Peterson and Peck detrimentally suffered or that they were
intended third party beneficiaries. Hence, without establishing that Peterson and Peck
could have relied on the theory of promissory estoppel, the Vernons and Granado cannot,
as third party beneficiaries, estop the city under promissory estoppel. See id. Thus, we
conclude that there is no evidence to support the trial courtâs judgment. Additionally, on
issue seven, we conclude that, with no evidence to support the judgment, the Vernons and
Granado are not entitled to damages under a contractual theory or promissory estoppel. 

Â Â Â Â Â Â Â Â Â Â In our determination of issues one, two, and three, we have presumed as correct
the trial courtâs decisions on admission of the city councilâs minutes (issue four), the
determination that the Vernons and Granado did not have services equal to other residents
(issue five), and that the city prevented access by the Vernons and Granado to Nottingham
Lane by fencing its property (issue six). All of these findings were factual determinations
within the trial courtâs discretionary authority. Since we have reversed the trial courtâs
judgment, even with these presumptions, we will forego further discussion of those issues. 
Tex. R. App. P. 47.1.
Â Â Â Â Â Â Â Â Â Â Â On issue eight, the decision to award attorney fees is reviewed under the abuse of
discretion standard. See Crouch v. Tenneco, Inc., 853 S.W.2d 643, 646 (Tex.App.âWaco
1993, writ denied). A review of the Vernons and Granadoâs Amended Petition for Writ of
Mandamus, Injunction, Declaratory Judgment, and Breach of Agreement shows that the
Vernons and Granado sought attorney fees under the Declaratory Judgments Act and as
a result of breach of the agreement. With the trial court having concluded that there was
no contract between Grey Forest and the Vernons or Granado, and with our conclusion
that the Vernons and Granado failed to establish promissory estoppel as a party or as a
third party beneficiary, the Vernons and Granado are not entitled to damages or attorney
fees under the theories of breach of contract or promissory estoppel. Under the
Declaratory Judgments Act, the act provides that a person interested under a deed or other
writing constituting a contract may have the court determine any question of construction
or validity arising under the instrument and obtain a declaration of rights, status, or other
legal relations under it. Tex. Civ. Prac. & Rem.Code Ann. Â§ 37.004(a) (Vernon Supp.
2007). It also provides that the court may award costs and attorney fees. Id. Â§ 37.009. 
However, declaratory relief may not be used solely as a vehicle to obtain attorney fees and
is inappropriate if it will serve no useful purpose. Boatman v. Lites, 970 S.W.2d 41, 43
(Tex.App.âTyler 1998, no pet.). The Vernonsâ and Granadoâs request for declaratory
judgment presented no issues beyond those already raised and have no greater
ramifications than the claims for breach of contract or promissory estoppel. Therefore, we
agree with Grey Forestsâ eighth issue and find no basis for the award of attorney fees to
the Vernons and Granado. 
Conclusion
Â Â Â Â Â Â Â Â Â Â For the foregoing reasons, we reverse and render a judgment that the Vernons and
Granado take nothing on their claims on damages and attorney fees under breach of
contract, promissory estoppel, or under the Declaratory Judgments Act. Â 
Â 
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Mackey K. Hancock

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice










st-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraph, li.MsoListParagraph, div.MsoListParagraph
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpFirst, li.MsoListParagraphCxSpFirst, div.MsoListParagraphCxSpFirst
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpMiddle, li.MsoListParagraphCxSpMiddle, div.MsoListParagraphCxSpMiddle
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpLast, li.MsoListParagraphCxSpLast, div.MsoListParagraphCxSpLast
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoQuote, li.MsoQuote, div.MsoQuote
 {mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Quote Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:black;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoIntenseQuote, li.MsoIntenseQuote, div.MsoIntenseQuote
 {mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Intense Quote Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:.65in;
 margin-bottom:14.0pt;
 margin-left:.65in;
 line-height:115%;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD .5pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleEmphasis
 {mso-style-priority:19;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:gray;
 font-style:italic;}
span.MsoIntenseEmphasis
 {mso-style-priority:21;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleReference
 {mso-style-priority:31;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 text-decoration:underline;
 text-underline:single;}
span.MsoIntenseReference
 {mso-style-priority:32;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 letter-spacing:.25pt;
 font-weight:bold;
 text-decoration:underline;
 text-underline:single;}
span.MsoBookTitle
 {mso-style-priority:33;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 letter-spacing:.25pt;
 font-weight:bold;}
p.MsoTocHeading, li.MsoTocHeading, div.MsoTocHeading
 {mso-style-noshow:yes;
 mso-style-priority:39;
 mso-style-qformat:yes;
 mso-style-parent:"Heading 1";
 mso-style-next:Normal;
 margin-top:24.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.Heading1Char
 {mso-style-name:"Heading 1 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 1";
 mso-ansi-font-size:14.0pt;
 mso-bidi-font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 font-weight:bold;}
span.Heading2Char
 {mso-style-name:"Heading 2 Char";
 mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 2";
 mso-ansi-font-size:13.0pt;
 mso-bidi-font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading3Char
 {mso-style-name:"Heading 3 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 3";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading4Char
 {mso-style-name:"Heading 4 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 4";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.Heading5Char
 {mso-style-name:"Heading 5 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 5";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;}
span.Heading6Char
 {mso-style-name:"Heading 6 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 6";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 font-style:italic;}
span.Heading7Char
 {mso-style-name:"Heading 7 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 7";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.Heading8Char
 {mso-style-name:"Heading 8 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 8";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;}
span.Heading9Char
 {mso-style-name:"Heading 9 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 9";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.TitleChar
 {mso-style-name:"Title Char";
 mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Title;
 mso-ansi-font-size:26.0pt;
 mso-bidi-font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;}
span.SubtitleChar
 {mso-style-name:"Subtitle Char";
 mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Subtitle;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 font-style:italic;}
span.QuoteChar
 {mso-style-name:"Quote Char";
 mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Quote;
 color:black;
 font-style:italic;}
span.IntenseQuoteChar
 {mso-style-name:"Intense Quote Char";
 mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Intense Quote";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
p.NewDocument, li.NewDocument, div.NewDocument
 {mso-style-name:"New Document";
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 mso-bidi-font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;
 mso-bidi-language:EN-US;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.SpellE
 {mso-style-name:"";
 mso-spl-e:yes;}
span.GramE
 {mso-style-name:"";
 mso-gram-e:yes;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 font-size:10.0pt;
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:Arial;
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:Arial;}
 /* Page Definitions */
 @page
 {mso-footnote-separator:url("07-09-0301.cr%20concurring%20opinion_files/header.htm") fs;
 mso-footnote-continuation-separator:url("07-09-0301.cr%20concurring%20opinion_files/header.htm") fcs;
 mso-endnote-separator:url("07-09-0301.cr%20concurring%20opinion_files/header.htm") es;
 mso-endnote-continuation-separator:url("07-09-0301.cr%20concurring%20opinion_files/header.htm") ecs;}
@page Section1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-title-page:yes;
 mso-footer:url("07-09-0301.cr%20concurring%20opinion_files/header.htm") f1;
 mso-paper-source:0;}
div.Section1
 {page:Section1;}
-->








NOS. 07-09-00301-CR, 07-09-0302-CR, 07-09-0303-CR,

07-09-0304-CR,
07-09-0305-CR, 07-09-0306-CR

Â 

IN THE COURT OF APPEALS

Â 

FOR THE
SEVENTH DISTRICT OF TEXAS

Â 

AT
AMARILLO

Â 

PANEL D

Â 



AUGUST
20, 2010

Â 



Â 

VIENGKHONE SIKALASINH, APPELLANT

Â 

v.

Â 

THE STATE OF TEXAS, APPELLEE 



Â 



Â 

 FROM THE 47TH DISTRICT COURT OF POTTER
COUNTY;

Â 

NOS. 58,210-A, 58,211-A, 58,212-A, 58,213-A, 58,216-A, 58,217-A;

Â 

HONORABLE HAL MINER, JUDGE



Â 



Â 

Before QUINN,
C.J., and CAMPBELL and PIRTLE, JJ.

Â 

Â 

CONCURRING OPINION

Â 

The Court reaches the correct result
in this case, and I concur in the CourtÂs judgment.Â  I concur also in the CourtÂs discussion of
appellantÂs issues one and two, regarding attorneyÂs fees.Â  With regard to appellantÂs issue three
regarding witness fees, the Court correctly points out that, even before its
1999 repeal, subsection (a) of article 102.002(a) of the Code of Criminal
Procedure expressly excluded witness expenses paid under article 35.27 from its
provisions.Â  See Act of May 17, 1985, 69th Leg., R.S., ch.
269, Â§ 1, 1985 Tex. Gen. Laws 1300, 1302, repealed
by Act of May 22, 1999, 76th Leg. R.S., ch. 580,
Â§ 11, 1999 Tex. Gen. Laws 3121, 3123.Â Â 
The Court thus correctly concludes that repeal of subsection (a) of
article 102.002 cannot have the effect of authorizing the assessment against
appellant of the cost of witness fees paid under article 35.27.Â  

It seems to me, however, that there
is a more fundamental problem with the StateÂs position that article 102.002
provides a statutory basis for imposition of non-resident witness expenses on
appellant.Â  In pertinent part, subsection
(c) of article 102.002, on which the State relies, states Âa defendant is
liable on conviction for the fees provided by this article for witnesses . . .
.ÂÂ  Tex. Code Crim. Proc.
Ann. art. 102.002(c) (Vernon 2006).Â  The CourtÂs opinion quotes the repealed
subsection (a) of article 102.002.Â  That
now-repealed subsection provided per diem and mileage reimbursement for
witnesses.Â  See Act of May 17, 1985, 69th Leg., R.S., ch.
269, Â§ 1, 1985 Tex. Gen. Laws 1300, 1302, repealed
by Act of May 22, 1999, 76th Leg. R.S., ch. 580,
Â§ 11, 1999 Tex. Gen. Laws 3121, 3123.Â 
Since the repeal of its subsection (a), however, article 102.002 does
not provide fees for witnesses.Â  Under
the current provisions of article 102.002, as I read them, there are no Âfees
provided by this articleÂ for which a convicted defendant may be liable.Â  For that reason, I concur in the CourtÂs
judgment.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  James
T. Campbell

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Quinn, C.J.,
joins in this concurring opinion.

Â 

Publish.Â